# EXHIBIT A

FILED
DALLAS COUNTY
10/10/2017 3:01 PM
FELICIA PITRE
DISTRICT CLERK

Freeney Anita



CAUSE NO. DC-17-13962 _____

| | | |
|---|---|---|
| **PREMIER ELECTRONICS, L.L.C.** | § | **IN THE DISTRICT COURT OF** |
| *Plaintiff,* | § | |
| | § | |
| **v.** | § | **DALLAS COUNTY, TEXAS** |
| | § | |
| **ADT, L.L.C.,** | § | M-298TH |
| *Defendant.* | § | _____ **JUDICIAL DISTRICT** |

---

## PLAINTIFF'S ORIGINAL PETITION

---

Plaintiff Premier Electronics, L.L.C. ("Premier") files this Plaintiff's Original Petition.

### I.
### DISCOVERY LEVEL (Level 2)

1.      Discovery is intended by Premier to be conducted pursuant to Rule 190.3 of the Texas Rules of Civil Procedure.

### II.
### PARTIES

2.      Premier is a Texas limited liability company with its principal office located in Dallas County, Texas.

3.      Defendant ADT, L.L.C. ("ADT") is a Delaware limited liability company which is duly authorized to engage in business in the State of Texas. ADT may be served with citation and a copy of this petition by serving its registered agent for service of process, C.T. Corporation System, at the following address:

> C.T. Corporation System
> 1999 Bryan St., Ste. 900
> Dallas, TX 75201-3136

## III.
## SUBJECT MATTER JURISDICTION & VENUE

4.      Jurisdiction is proper in this Court because the damages sought, exclusive of interest and costs, are within the jurisdictional limits of this Court.

5.      Pursuant to Sections 15.002(a)(1) and (3), venue is proper in Dallas County because all or a substantial part of the events or omissions giving rise to the claim occurred in Dallas County, Texas, because Dallas County is the county of ADT's principal office in this state, and it is not a natural person.

## IV.
## CLAIM FOR RELIEF

6.      Pursuant to Rule 47 of the Texas Rules of Civil Procedure, in this case Premier seeks monetary relief over $1,000,000, including damages of any kind, penalties, costs, expenses, prejudgment interest and attorney fees.

## V.
## FACTS

7.      Premier is engaged in the business of installing, maintaining, and monitoring fire, burglary, and alarm systems in the state of Texas.

8.      Republic Property Group ("Republic") is a real estate development group which owns and develops residential communities in the North Texas area.

9.      In 2012, Republic sent a Request for Proposal to Premier proposing an agreement to install, monitor, and service security systems in an entire residential community consisting of 2,300 single family homes and 600 townhomes with a guaranteed penetration rate of 100% of homes in the community.  Republic represented that it was in the process of developing an additional master-planned community in the DFW area which, at build-out, would include over 3,000 homes.  Republic represented to Premier that it intended to enter into similar agreements

2

with the same security partner for both of these communities, and others in the future for many additional homes that were not yet under contract and was seeking a proposal with prices and terms predicated upon an minimum volume of 6,000 homes and a very high likelihood of any additional new Republic developments in the future, adding additional volume. Premier and Republic had previously discussed such a business relationship. In response to the Request for Proposal, Premier made a proposal and entered into negotiations with Republic and companies affiliated with Republic.

10.     PCR Land Company, L.L.C. (the "Developer") is a Republic-affiliated development company that developed a residential development known as Phillips Creek Ranch located in the City of Frisco, Denton County, Texas ("PCR" or the "Development"). PCR Community Association, Inc. (the "Association") is a non-profit homeowners' association formed by the Developer to be ultimately be owned and managed by individual homeowners of residences (the "Residences") located in PCR for the purpose of owning, operating, and managing the common areas located within the Development. At all relevant times, the Developer controlled the Association.

11.     Effective September 4, 2012, Premier, the Developer, and the Association entered into a written Security System Agreement (the "Agreement"). Pursuant to the Agreement, Premier agreed to provide alarm monitoring services as described in the Agreement for all Residences located within the Development. Premier agreed to provide alarm monitoring services for each Residence in the Development at a substantially discounted price based upon the volume of homes Republic had represented to Premier would ultimately be included in the planned business relationship for its two newest communities and, in all likelihood, similar opportunities for planned upcoming future communities.

3

**12.**     Pursuant to the Agreement, Premier agreed to install security systems (the "Systems") in all Residences located within the Development if requested by the company constructing the Residences (the "Homebuilder") a cost of $700.00 per Residence to be paid by the Homebuilder.  The Agreement includes specifications for such Systems as well as a limited warranty as further described in the Agreement.  In the event that a Homebuilder did not request Premier to install the System in a particular Residence, Premier could require the Homebuilder to correct any deficiencies in the System installed prior to providing any monitoring services.

**13.**     Pursuant to the Agreement, the owner(s) of each residence would enter into a separate Security Monitoring Agreement with Premier upon completion of the Residence when the security system was first activated.  For an Initial Term of thirty-six months beginning after the date of the tenth system activation for an included Residence, the Association agreed to a bulk billing arrangement pursuant to which the Association would collect Premier's charges for its alarm monitoring service as part of the Homeowner's dues for each Residence.  The amount of HOA dues was accordingly calculated to include this charge.  Pursuant to the Agreement, Premier would invoice the Association, rather than individual homeowners, for the monthly service fee, and the Association would remit payment to Premier.  Along with the promised volume, this bulk billing arrangement allowed Premier to provide its monitoring services to PCR Homeowners at approximately half price.  The tenth system activation occurred on July 18, 2013, at the PCR residence located at 6318 Chimney Peak. This particular term was a significant and material part of the parties' agreement to secure the pricing agreed to by Premier.

**14.**     Pursuant to the Agreement, the term of the Agreement automatically renewed for successive thirty-six month renewal terms after the expiration of the initial term, unless terminated by the Association by written notice delivered sixty days prior to the commencement

4

of any renewal term. Although it was always contemplated that the Agreement would continue through build-out of the Development so that Republic could reach the volume of homes represented in order to secure the agreed pricing, this automatic renewal term further ensured Premier that it would reach the volume justifying its deep discounts.

15.     The Agreement permits Premier to terminate the Agreement at any time upon ninety days written notice to the Association. If Premier had elected to terminate the Agreement prior to the expiration of the 36-month term, all of Premier's right, title, and interest to the Systems would pass to the Association. Premier never elected to terminate the Agreement and, therefore, retained all of its right, title, and interest to the Systems.

16.     The Agreement states that if Premier files for bankruptcy, becomes insolvent, or defaults, all of Premier's right, title, and interest to the Systems would pass to the Association. Premier has never filed for bankruptcy, is not insolvent and has fulfilled all of its obligations in accordance with the Agreement; therefore, Premier has retained all of its right, title, and interest to the Systems.

17.     The Agreement permits Premier to sell its interest, but only if it sells substantially all of its assets. There has never been an offer from the developer or from ADT to purchase Premier's interest or its assets. Premier did not sell, and had no intention of or plans to sell, any of its interests or assets. Therefore, Premier retained all of its right, title, and interest to the Systems and monitored account base.

18.     This particular business model with pre-designed system specifications mandated by the developer to the builder, a low initial installation fee, and bill collection of alarm monitoring fees by the homeowners' association was all part of a unique business formula developed by Premier and discussed with Republic in confidence under circumstances in which a

5

person would reasonably conclude that such information should not be publicly disclosed. This business formula created a "first to market" advantage for Premier with limitless opportunity for many years during the biggest residential building boom in Texas history.

19.     The Agreement expressly permitted Association members or Homebuilders to request components and features other than, or in addition to, those specified in the Agreement; however, it further provided that such person would be responsible for the additional cost of the requested modifications to the Systems installed in the Residences. The Agreement required Premier and each Homeowner to execute a separate Residential-Central Alarm Monitoring Agreement in a specified form which included, among other terms, a provision which reads:

> THE SERVICES PROVIDED BY PREMIER UNDER THE ASSOCIATION AGREEMENT DO NOT INCLUDE FIRE MONITORING SERVICES. ANY FIRE MONITORING, CELULAR MONITORING OR AUTOMATION SERVICES SHALL BE PROVIDED TO THE MONITORED PREMISES ONLY UNDER A SEPARATE WRITTEN AGREEMENT BETWEEN HOMEOWNER AND PREMIER.

Additional components and features could be selected by each Homeowner under terms and pricing negotiated separately between Premier and the Homeowner. The price for these additional components and features were not subject to the bulk billing arrangement with the Association.

20.     After the Agreement was executed, Premier performed all of its obligations under the Agreement. When requested by Homebuilders, Premier installed Systems complying with the specifications set forth in the Agreement, activated its Monitoring Services and Remote Access Services, billed the Association for alarm monitoring services and billed individual Homeowners directly for additional services as specified in the Agreement. Premier fully complied with all warranty and maintenance obligations under the Agreement.

21.     During the initial term of the Agreement, many if not all, PCR Homeowners requested and received modifications to the Systems prescribed by the Agreement to provide for one or more of the following additional services: fire services, cellular alarm transmission services (as opposed to using a traditional landline), automation, remote access, etc. As required by the Agreement, Premier entered into separate written agreements with each Homeowner in PCR who requested monitoring services, cellular alarm transmission services or other modifications to the Systems prescribed by the Agreement. These required separate written agreements permitted Homeowners to avoid paying, or to greatly reduce, the upfront cost of installation, and allowed Homeowners to receive the deeply discounted price, by agreeing to a specified term of service, typically 60 months from the date of activation of the service for each Homeowner.

22.     Insight Association Management, L.P. ("Insight") is a property management company that was hired by the Developer to manage the Association. In that capacity, Insight became familiar with the Agreement, Premier's performance under the Agreement, and the large number of Homeowners who had entered into separate written agreements with Premier for alarm monitoring, cellular alarm transmission services and other modifications to the Systems prescribed by the Agreement.

23.     ADT is a competitor of Premier. Upon information and belief, in early 2016, ADT became familiar with the terms of the Agreement, Premier's performance under the Agreement, and the large number of Homeowners who had entered into separate written agreements with Premier for alarm monitoring, cellular alarm transmission services and other modifications to the Systems prescribed by the Agreement. ADT also became familiar with

7

Republic's Request for Proposal, its other communities in the DFW area, and its plan to enter into similar agreements with the same security partner for all of its communities.

24.     Upon information and belief, ADT, Insight, and the Developer devised a plan to steal Premier's business relationships with the PCR Homeowners by causing the Association to prematurely terminate the Agreement, requiring Homeowners to permit ADT or its representatives to remove Premier equipment from the Residences, to install ADT's own equipment, and to effectively steal the economic benefit of the Agreement from Premier by entering into a new similar agreement with ADT. Premier had plowed the fields, sowed the seeds, and provided everything necessary for strong growth, then ADT seized the harvest and the entire now well established field, and all future harvests, stealing the fruits of Premiers labor.

25.     To effectuate their scheme, Insight caused the Association to give written notice to Premier that the Association would not renew the Agreement upon expiration of the initial term.  Upon receipt of the notice, Premier inquired as to the reason for the notice as it had no reason to believe that the Developer or the Association were in any way displeased with its performance.  Moreover, the terms of the Agreement were premised upon a written proposal from the Developer requesting a bid predicated upon a much larger volume of Residences than had been constructed by April 2016.  In response to Premier's inquiry, Premier was informed that the Association actually had no intention of terminating the Agreement but had sent the written notice only in order to renegotiate certain terms of the Agreement.

26.     In May 2016, Insight informed Premier that it had received a proposal from ADT and discussed the terms of that proposal with Premier.  On behalf of the Association, Insight represented to Premier that if it met the terms discussed, the Association would, in fact, rescind the notice and continue its business relationship with Premier.  Premier agreed to meet the terms

8

discussed.  Notwithstanding the representations made by Insight to Premier, at the same time, the Developer who controlled the board of directors of the Association had already negotiated and then entered into a Bulk Monitoring Agreement with ADT (the "ADT Agreement") although Premier had unconditionally accepted a proposed new 10-year contract.  Insight knew of the ADT Agreement when Insight was making false representations to Premier concerning the April 2016 notice and the continuation of the Association's business relationship with Premier if it met the discussed terms.

27.     On or about May 11, 2016, ADT and Insight notified PCR Homeowners that the Association had entered into the ADT Agreement.  ADT and Insight further notified the PCR Homeowners that they were required to allow ADT to remove Premier's equipment, install ADT's own equipment, and reprogram their systems before June 21, 2016, even though the initial term of the Agreement between Premier, the Developer, and the Association would not expire until July 18, 2016.  The Agreement, however, does not give either the Developer or the Association any rights whatsoever in or to Premier individual security monitoring agreements with its individual customers who are PCR Homeowners.  Likewise, termination of the Agreement by the Association did not terminate Premier's individual security monitoring agreements with the Homeowners—only terminating the Association's obligation to collect the fee for Premier's alarm monitoring service as part of the Homeowners' HOA dues.

28.     Upon information and belief, Insight and ADT further notified Homeowners that the portion of their homeowners' dues which were being collected to pay Premier for its alarm monitoring services as provided in the Agreement would now be paid to ADT regardless of whether the Homeowner wished to continue using Premier's services.

9

**29.** Upon information and belief, Insight and ADT also notified Homeowners that they would no longer need to honor the terms of their separate written agreements with Premier for monitoring, cellular alarm transmission services and other modifications to the Systems prescribed by the Agreement.

**30.** On or about May 11, 2016, Insight notified Premier that the Association was, in fact, actually intending to terminate the Agreement at the end of the initial term and demanded that Premier provide to it the lockout code for the security systems in each of the residences in anticipation of changing alarm monitoring services of PCR Homeowners. The lockout code is proprietary to Premier and is a critical element to ensure that the life safety equipment installed by Premier cannot be compromised, bringing harm to the Homeowners. Although Premier was under no obligation to do so, and was adamantly opposed to doing so, acquiesced to these demands and provided the lockout code to Insight to be held in utmost confidence and not to be disclosed to anyone, including ADT. Upon information and belief, Insight immediately disclosed the lockout code to ADT, its employees and contractors, risking the safety of PCR residents, and creating a huge potential liability for Premier.

**31.** ADT immediately began scheduling appointments with PCR Homeowners, used Premier's lockout code to reprogram all the Systems, willfully and intentionally removed Premier equipment from the Residences, including cellular alarm transmission equipment, and, in every case, installed their own equipment in order to block Premier's access to the systems. The removal of Premier's equipment, installation of ADT's equipment, and changing of Premier's lockout code prevents Premier from providing the alarm monitoring, cellular alarm transmission, automation, remote access, fire protection and other services to Homeowners, and

warranty maintenance and installation services to builders, pursuant to the separate agreements between Premier and such Homeowners and builders.

32.     On May 13, 2017, Premier notified both ADT and Insight in writing that their actions constituted interference with Premier's exclusive rights under the Agreement, and Premier's rights pursuant to their separate agreements with PCR Homeowners.  Nevertheless, ADT persisted in removing Premier equipment from the Residences, installing their own, and changing the lockout codes.  ADT and Insight told PCR Homeowners that they were required to allow ADT service technicians to do so, notwithstanding the Homeowners' individual separate agreements with Premier.

33.     The Agreement involving PCR was only one piece of the business relationship outlined to Premier by Republic.  The prospective business relationship included not only PCR, but also two other communities—Light Farms and Walsh.  By 2016, Premier had already entered into a separate agreement concerning the Light Farms development.  Based upon Republic's representations to Premier, the parties expressly contemplated that a third agreement would be entered into concerning a third planned development known as Walsh.  Republic had represented to Premier that Walsh would ultimately include 17,000 homes at completion, making it the largest master-planned community ever built in the area.  Given that Republic-affiliated entities had already entered into agreements with Premier for two of its three new DFW communities, there was a reasonable probability that Premier would have entered into a business relationship with the Republic-affiliated developer and homeowners' association for the Walsh development under similar terms and conditions.

34.     Upon information and belief, ADT also intentionally interfered with Premier's prospective business relationship concerning the Walsh development by conduct that was

11

independently tortious or unlawful.  As a result of ADT's conduct, Premier has learned that Republic or its affiliate has entered into a bulk billing agreement with ADT for the Walsh development.

**35.**    All conditions precedent have been performed or have occurred.

V.
**CAUSES OF ACTION**

**Tortious Interference with Existing Contracts with PCR Homeowners**

**36.**    Premier has a series of individual security monitoring agreements and additional service agreements with all, or essentially all, of the PCR Homeowners whose Residences were built before July 18, 2016.  ADT willfully and intentionally interfered with those contracts. ADT's interference proximately caused injury to Premier.  Premier incurred actual damage or loss as a result of such interference in an amount which exceeds the minimum jurisdictional limits of this Court.  The exact amount of such damages will be determined at a later date.

**Tortious Interference with Prospective Relations with PCR Homeowners**

**37.**    There was a reasonable probability that Premier would have entered into additional individual security monitoring agreements and additional service agreements with all, or essentially all, PCR Homeowners who had not yet signed such agreements with Premier. ADT intentionally interfered with these relationships by conduct which was independently tortious or unlawful.  ADT's interference proximately caused injury to Premier.  Premier incurred actual damage or loss as a result of such interference in an amount which exceeds the minimum jurisdictional limits of this Court.  The exact amount of such damages will be determined at a later date.

12

**Tortious Interference with Existing Contract with the Developer and the Association**

38.      Premier, the Developer, and the Association were parties to the Agreement.  ADT willfully and intentionally interfered with the Agreement.   ADT's interference proximately caused injury to Premier.  Premier incurred actual damage or loss as a result of such interference in an amount which exceeds the minimum jurisdictional limits of this Court.  The exact amount of such damages will be determined at a later date.

**Tortious Interference with Existing Prospective Relations with Builders**

39.      Premier had existing business relations with the builders who were building residences in PCR which including security system installation as well as other low-voltage integration services.  There was a reasonable probability that Premier would have entered into additional security system installation agreements, as well as other low-voltage installation integration service agreements, with all, or essentially all, of the homebuilders constructing residences at PCR.  ADT intentionally interfered with these relationships by conduct which was independently tortious or unlawful.  ADT's interference proximately caused injury to Premier. Premier incurred actual damage or loss as a result of such interference in an amount which exceeds the minimum jurisdictional limits of this Court.  The exact amount of such damages will be determined at a later date.

**Tortious Interference with Prospective Relations with respect to Walsh**

40.      There was a reasonable probability that Premier would have entered into an agreement with the developer and homeowners' association for the Walsh development, along with additional individual security monitoring agreements with all, or essentially all, Walsh homeowners.   ADT intentionally interfered with these relationships by conduct which was independently tortious or unlawful.  ADT's interference proximately caused injury to Premier.

13

Premier incurred actual damage or loss as a result of such interference in an amount which exceeds the minimum jurisdictional limits of this Court. The exact amount of such damages will be determined at a later date.

**Exemplary Damages**

**41.** The harm for which Premier seeks recovery results from the fraud, malice, or gross negligence of ADT. Accordingly, in addition to actual damages, Premier seeks exemplary damages from ADT pursuant to Chapter 41 of the Texas Civil Practice and Remedies Code.

## VI.
## VICARIOUS AND PARTICIPATORY LIABILITY

**Civil Conspiracy**

**42.** ADT, Insight, and others were members of a combination of two or more persons who colluded together to accomplish an unlawful purpose, or a lawful purpose by unlawful means, as described in this petition. The members of this conspiracy had a meeting of the minds on the object of their combination and their course of action. One or more of the members of this conspiracy committed an unlawful, overt act to further the object or course of action, as described in this petition. Plaintiffs suffered damages in excess of the minimum jurisdictional limits of this Court as a proximate result of the wrongful act underlying the conspiracy. As a result, ADT is jointly and severally liable for all acts done by any members of the conspiracy in furtherance of their unlawful combination.

## PRAYER

**FOR THESE REASONS,** Premier prays that this Court award judgment in its favor and against ADT for:

1. Actual damages, including special damages for lost profits and the cost to replace accounts;

14

2.      Exemplary damages;

3.      Prejudgment interest and post-judgment interest as provided by law; and

4.      Costs of court.

Plaintiff prays for general relief.

Respectfully submitted,

*/s/ John M. Frick*

John M. Frick
State Bar No. 07455200
*jfrick@bennettweston.com*

BENNETT, WESTON, LAJONE & TURNER, P.C.
1603 LBJ Freeway, Suite 280
Dallas, Texas  75234
Tel:    (972) 662-4901
Fax:    (214) 393-4043

ATTORNEYS FOR PLAINTIFF
PREMIER ELECTRONICS, L.L.C.